Matthew G. Monforton  (Montana Bar # 5245)
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Telephone:      (406) 570-2949
Facsimile: (406) 551-6919
E-mail:    matthewmonforton@yahoo.com

Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| **JOHN DOE,** | |
| **Plaintiff,** | |
| | **Civil Action No.** CV-17-15-BU-SEH |
| **v.** | |
| **MONTANA STATE UNIVERSITY, DR. WADED CRUZADO, DR. ROBERT MOKWA, JYL SHAFFER, JAMES SLETTEN, AND KATHARINE KUJAWA,** *employees of Montana State University, sued in his or her official and individual capacity, jointly and severally,* | |
| **Defendants.** | |

## **COMPLAINT**

John Doe[1], by and through his undersigned attorney, files this complaint for gender-based discrimination in violation of Title IX (20 U.S.C. § 1681), violations of his rights under the First Amendment of the United States Constitution, violations of the due process and equal protection requirements of the Fourteenth Amendment to the United States Constitution, and the Equal Rights and Due Process Clauses of the Montana Constitution, as well as for common law negligence and breach of contract. In support of this complaint, plaintiff John Doe states as follows:

## **THE PARTIES AND JURISDICTION**

1.    Plaintiff John Doe is, and at all times relevant to this Complaint has been, a resident of the State of Montana. Plaintiff was also a student of Montana State University in Bozeman, Montana beginning in the summer term of 2014 and continuing until the summer term at issue in this complaint.

---

[1] "John Doe" is not the Plaintiff's real name. Due to the nature of the allegations in this lawsuit, Mr. Doe is proceeding under a pseudonym to protect his privacy and out of fear of retaliation and to protect the identity of his accuser, who is identified as "Jane Roe." In using a pseudonym, Doe relies upon *Does I thru XXIII v. Advanced Textile Corp*, 214 F.3d 1058, 1069-71 (9th Cir. 2000).

2

2.   Defendant Montana State University (the "University") is a public university incorporated, and with its principal place of business located, in the State of Montana.

3.   Defendant Waded Cruzado is president of the University and resides in Montana.

4.   Defendant Robert Mokwa is or was at pertinent times Interim Executive Vice President for Academic Affairs and Provost and resides in Montana.

5.   Defendant Jyl Shaffer is the Director and Title IX Coordinator in the Office of Institutional Equity at the University and resides in Montana.

6.   Defendant James Sletten is or was at pertinent times Deputy Title IX Coordinator in the Office of Institutional Equity at the University and resides Montana.

7.   Defendant Katharine Kujawa is or was at pertinent times an Instructor in the Department of Psychology at the University and resides in Montana.

8.   The Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because Doe's claims arise under the United States Constitution, brought

3

pursuant to 42 U.S.C. § 1983, and under the laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88. The state law and common law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

## STATEMENT OF FACTS

9. Doe enrolled in Contemporary Issues in Human Sexuality at Montana State University in Bozeman, Montana for the 2016 summer semester. This class was taught by Katharine Kujawa.

10. Doe was required to take a diversity course as part of his studies. Contemporary Issues in Human Sexuality fulfilled this requirement.

11. Kujawa required all students to sign a confidentiality agreement at the start of the semester. This agreement stated that students would not discuss or share any information about other students outside of class.

12. On Tuesday, May 24, 2016, Doe attended his regularly scheduled class. The topic of discussion on this day was transgender issues. A fellow student in the class, Jane Roe,

4

identifies as transgender and had informed the class of this during one of the previous class discussions.

13. Because Doe objects to transgenderism, he opted not to speak in class that day. He also declined to write the required reflection paper because he was uncomfortable reducing his personal feelings to paper, as he knew his beliefs were unpopular. Instead he went to Kujawa's office to discuss his views on transgender identity with her privately for half credit on the assignment. Doe did not wish to upset Roe with his personal beliefs.

14. During this conversation, Kujawa asked Doe hypothetical questions about how he would react to Roe if she approached Doe outside the classroom. Kujawa claims that Doe stated he would ask Roe to leave him alone, and if she continued to try to speak with him, he would "break her face."

15. In the course of his conversation with Kujawa, Doe related a story of an altercation he was involved in nine years earlier with a gay man. In relaying the story, Doe explained that he hit the gay man after the man groped Doe's girlfriend. Doe explained that he did not know the man was gay at the time of the altercation. Doe's intention in relaying this story was to explain that the only time he

5

was ever in an altercation with a member of the LGBTQ (lesbian, gay, bisexual, transgender, and queer) community, it was for reasons wholly unrelated to the person's sexual orientation.

16.    Doe remembers the conversation with Kujawa and he told her in response to her questions that he would ask Roe to leave him alone, but he does not recall saying he would "break her face" in any context regarding Roe. The conversation lasted about 45 minutes and covered a variety of topics unrelated to class before Doe left Kujawa's office.

17.    During Kujawa's class on May 26, 2016 when Roe entered the classroom, Kujawa asked Roe to move seats so she was not sitting near Doe. After class, Kujawa pulled Roe aside and, in violation of the confidentiality agreement, informed her that Doe had made threatening statements against her and that she should avoid being near him.

18.    Kujawa asked Roe if she would like to be accompanied to the Office of Institutional Equity (OIE) to speak with the Title IX officer, and Roe showed Kujawa a pocket knife and stated that she did not need an escort and knew exactly what she needed to do. Roe immediately went to OIE and filed a Title lX complaint against Doe.

6

## THE INVESTIGATION

19.   Roe first met with Jyl Shaffer, the Title IX Officer in OIE. Shaffer took Roe's initial statement and discussed with her how OIE could handle her complaint. Roe was never informed she had an option to file an informal complaint even though required by university policy.

20.   While Roe was still in her office, Shaffer called Kujawa and took her statement. Kujawa related her entire private conversation with Doe to Shaffer with Roe listening, including Kujawa's own interpretations and fears associated with Doe's demeanor.

21.   Shaffer then explained to Roe that she would assign James Sletten of OIE as the investigator handling her case. Roe approved of this choice because she liked Sletten after previously working with him through his position with OIE.

22.   On the morning of Thursday, May 26, 2016, Doe received notification from the MSU Dean of Students Office to report to the Dean's office after his regularly scheduled classes that afternoon. Doe was distressed by this news and left Kujawa's class early to see if he could see the Dean early and find out why they wanted to see

7

him. He was unable to meet with anyone until that afternoon around 3 p.m.

23. When Doe arrived at the Dean of Students Office, he met first with Aaron Grusonik, Associate Dean of Students. Grusonik informed Doe of the Title IX complaint filed against him and the basis of the complaint. Doe was given notice that he was no longer allowed on campus for the duration of the investigation and was provided a criminal trespass warning should he come to campus or attend any university function without prior approval. Doe was also provided a no-contact order to ensure he did not have contact with Roe. Grusonik informed Doe of his rights for school disciplinary proceedings, including his option to participate in the investigation or not.

24. After meeting with Grusonik, an MSU police officer met with Doe, read him his rights, and questioned him about his conversation with Kujawa and any intentions Doe had towards Roe. The officer took a statement from Doe, then accompanied him to his vehicle and ensured Doe departed campus.

25. Doe wished to participate in the investigation so that it could be quickly resolved and he could return to class. He attempted to

schedule an interview with Sletten on both May 27 and May 28, 2016 and both times Sletten put off Doe saying he was not ready to conduct the interview.

26.   Sletten interviewed seven witnesses between May 31 and June 2, 2016. Sletten conducted a second interview with Kujawa on May 31 shortly before he interviewed Doe for his statement. In his interview, Doe provided a letter for Roe in which he explained that he wished no harm against her and that he believed the situation was a misunderstanding and misinterpretation of his statements. Doe requested Sletten pass on the letter as he could not give it to Roe due to the no contact order. Sletten never provided this letter to Roe.

27.   Sletten interviewed Doe for almost two hours, focusing on the content of Doe's conversation with Kujawa and addressing several concerns Kujawa had after their meeting. Doe repeatedly explained that his statements were misconstrued and that he did not wish any harm to Roe and that although he objected to transgenderism, he did not care how she chose to live her life. Doe clarified that he had never spoken directly to Roe during class and had never seen her outside of the classroom.

9

28. After the investigation was complete, Sletten provided both Doe and Roe a copy of the initial report of evidence so that they could correct their statements if there were any discrepancies. Doe notified Sletten of several issues throughout the witness statements, including inconsistent dates, particularly involving the testimony of another student identified as Witness B.

29. Sletten finalized the Report of Investigation based on that feedback, but in addressing the discrepancies with Witness B's statement, Sletten clarified the dates with Roe, not with Witness B who gave the statement.

30. Sletten stated that it was reasonable to believe Kujawa's version of the conversation with Doe because Doe could not provide evidence to explicitly refute Kujawa's version of events, even though no independent witness overheard the conversation. Sletten made a judgment call that a professor at the University was more believable than a student, without any grounds to support one version of the story over another.

31. Sletten analyzed Doe's statements and Kujawa's response to them, and determined that "There is no reason to doubt [Doe]'s claim that he did not intend to cause harm . . . However,

10

harassment can occur even when someone does not intend to cause harm." This decision clearly recognizes that Doe did not harbor any ill will towards Roe, and yet still finds that he violated a University policy and harassed a student with whom Doe never had any direct contact in a clear showing of bias in favor of Roe.

## UNIVERSITY POLICIES AND PROCEDURES

32.   The University's policy on Discrimination, Harassment, Sexual Misconduct, Dating Violence, Domestic Violence, Stalking and Retaliation (hereafter "Discrimination Policy") implements the objectives of Title IX of the Education Amendments of 1972 and its implementing regulation, 34 C.F.R. § 106.31(a) and states that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by the university."

33.   Section 224.00 of the Discrimination Policy defines Hostile Environment Harassment as "a hostile environment based on [protected categories including sex] exists when harassment: is sufficiently serious (i.e., severe, pervasive, or persistent) and objectively offensive so as to deny or limit a person's ability to

11

participate in or benefit from the University's programs, services, opportunities, or activities; or when such conduct has the purpose or effect of unreasonably interfering with an individual's employment or academic performance." Section 224.00 continues with five factors that must be considered in determining whether harassment creates a hostile environment.

34.    Section 250.00 of the Discrimination Policy further clarifies that "This policy shall not be construed or applied to restrict academic freedom at the campuses of Montana State University, nor shall it be construed to restrict constitutionally protected expression, even though such expression may be offensive, unpleasant, or even hateful."

35.    Section 270.00 of the Discrimination Policy clearly states that all University employees must complete discrimination and harassment prevention training and complete the University's Title IX online training within 45 days of employment.

36.    Section 210.00 of the Discrimination Policy provides that Jyl Shaffer, as Director of the Office of Institutional Equity/Title IX Coordinator, is the Responsible Official ("RO") to whom alleged violations of this policy should be reported.

12

37. The University's Discrimination Grievance Procedures for Allegations of Violations of the Discrimination, Harassment, Sexual Misconduct, Dating Violence, Domestic Violence, Stalking and Retaliation Policy (hereafter "Grievance Procedures") provides guidance to the Responsible Official and her staff members on how "to provide prompt and equitable resolution of reports of discrimination based upon [protected categories]" in violation of the Discrimination Policy. It outlines procedures for the handling of both formal and informal complaints and provides a timeline for resolution of complaints.

38. Section 220.00 of the Grievance Procedures states that all parties, including complainant and respondent, have privacy rights and reasonable expectations of confidentiality in the investigation of potential policy violations.

39. Section 300.00 of the Grievance Procedures states that the "RO will explain to both parties the informal and formal processes" provided for resolution. The section clearly mandates that the "RO is charged with coordinating the University's compliance with federal civil rights laws . . . The RO is not an advocate for either the Complainant or Respondent."

40. Section 400.00 of the Grievance Procedures provides guidelines and rights of the parties to appeal the findings of the RO's initial investigation and lays out four grounds for appeal: 1) The investigation was not conducted in compliance with the procedures and the non-compliance materially affected the outcome of the investigation; 2) The RO failed to conduct an adequate investigation; 3) The RO had a conflict of interest which resulted in unfair bias against the appellant; and 4) The appellant has discovered new evidence, not previously available, which would have materially affected the outcome of the investigation.

41. The University's Free Speech Policy states that the University "supports and encourages diverse points of view, though they may sometimes seem distasteful or offensive, as this is the nature of the University's educational responsibility and is safeguarded by the freedom of expression. . . . [The University] recognizes the First Amendment Rights to expression."

## ADMINISTRATIVE APPEALS

42. Doe filed an appeal of OIE's decision that he was guilty of Hostile Environment Harassment to University President Waded Cruzado, in accordance with the University's policy, citing grounds

14

one through three as stated in the University's Grievance
Procedures. President Cruzado recused herself and Interim
Executive Vice President for Academic Affairs and Provost, Dr.
Robert Mokwa, was appointed to oversee the appeal and issue the
University decision. Doe was granted a hearing on appeal and a
third party, Assistant Attorney General Robert Stutz, was appointed
as the hearing officer.

43.     Despite Doe's allegations that the investigator failed to
conduct a fair and unbiased investigation, the hearing officer
deferred to the investigator, Sletten, in deciding the appropriate role
that the investigator would have in considering the appeal.

44.     During his appeal hearing, Doe was unable to question Roe or
Kujawa, neither of whom was required to be present and answer
questions despite being the catalysts for the complaint. Doe
questioned Shaffer and Sletten, but neither of them cooperated or
answered his questions regarding the investigation procedures.

45.     Following the University's decision to uphold OIE's initial
findings, Doe was formally sanctioned by the University. The
sanctions included suspension for the remainder of the Fall 2016
semester, a Campus Trespass Notice denying Doe the right to be at

any University facility or property, a permanent No Contact order with Roe, a requirement to attend Anger Management training that is approved by Shaffer, completion of civil rights training with Shaffer, and a Campus Safety Review, which includes submission of a campus safety questionnaire that must be submitted for review and recommendation on re-enrollment.

46. Doe filed an appeal of the University's final decision with the Montana Board of Regents, and the Commissioner upheld the University's decision on December 22, 2016.

## COUNT I – VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983

47. Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

48. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

49. Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

50. The University denied Doe's due process rights when it executed interim sanctions prior to any type of investigation or

16

hearing, it conducted a biased investigation, it allowed a single person to investigate the claim, analyze the evidence, and determine guilt and appropriate punishment, and it failed to allow Doe to question witnesses, including Kujawa, during the appeal hearing.

51.    Doe was entitled to a fundamentally fair procedure to determine whether he was responsible for the alleged misconduct.

52.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

53.    Doe's reputation was damaged when his personal views were improperly shared with Roe in violation of a confidentiality agreement upon which he reasonably relied.

54.    Doe was entitled to a guarantee that the University faculty would abide by the Title IX Grievance Procedures and that his privacy would be protected as the University conducted a fair and impartial investigation.

55.    Kujawa denied Doe's liberty interest when she shared a private conversation with Roe and imparted her own fears on another student after Doe took deliberate steps to ensure Roe would not be confronted with his countering views.

56.    A person has a protected liberty interest in pursuing his education, as well as future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

57.    Doe was banned from campus and unable to attend classes throughout the investigation process, unfairly delaying his education.

58.    Doe was suspended for an additional semester as part of a sanction for an unjust charge of Hostile Environment Harassment.

59.    These charges will become a permanent part of Doe's student record which will follow him throughout any other education opportunities.

60.    As a result of these due process violations, Doe was suspended and suffers ongoing harm to his reputation and numerous damages. He was forced to withdraw from his classes, has lost one job due to absences related to handling the investigation and appeal and to Roe's misplaced attempt to obtain a protection order, and is marred by an erroneous record on his transcript that will always negatively affect future educational and employment opportunities.

18

61.  Doe also had to incur costs by relocating to a different MSU campus in order to enroll for the 2017 Spring Semester.

WHEREFORE, plaintiff John Doe prays judgment as hereinafter set forth.

## COUNT II – VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983

62.  Doe incorporates by reference all paragraphs of this Complaint as though fully set forth herein.

63.  The First Amendment to the United States Constitution states that "Congress shall make no law . . . abridging the freedom of speech."

64.  The First Amendment protections to speech apply in a higher education setting.

65.  Doe had the right to express his views on transgender identity and had the right to publicly or privately object to transgenderism without punishment for his beliefs.

66.  Doe's right to freedom of expression is further protected by the University's Free Speech Policy, which Doe reasonably relied on in his belief that he could speak his views on transgender identity to a member of the University faculty without fear of reprimand.

19

67.   Kujawa violated Doe's rights under the University's Free Speech Policy by encouraging him to share his personal views and then using that information to attack Doe for his protected beliefs.

WHEREFORE, plaintiff John Doe prays judgment as hereinafter set forth.

## COUNT III – VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972 UNDER 20 U.S.C. §1681

68.   Doe incorporates by reference all paragraphs of this Complaint as though fully set forth herein.

69.   Montana State University receives federal funding, including in the form of federal student loans given to students.

70.   Because it receives federal funding, the University is subject to the requirements of Title IX.

71.   Title IX prohibits discrimination in the education setting based on a student's gender. Unlawful gender discrimination also occurs when a university disciplines students based on improper assumptions about gender roles.

72.   The University treated Doe and Jane Roe differently under Title IX by ignoring Roe's threatening gesture of showing a pocket

knife when asked about her concerns about a potential encounter with Doe.

73.    Despite Doe never having spoken to Roe directly and making every effort to ensure Roe was not made aware of Doe's protected views on Roe's gender identity, the University sanctioned Doe for hostile environment harassment.

74.    The University failed to take any action when Roe showed a knife to Kujawa during a conversation about how she would react to an encounter with Doe. This behavior was not viewed by the University or Kujawa as threatening.

75.    In the context of a very similar conversation between Kujawa and Doe, the University found Doe created a hostile environment merely by stating his disagreement with Roe's lifestyle. Doe's alleged threat to "break her face" was taken out of context and misinterpreted from a conversation about a fight that occurred nine years prior to the conversation with Kujawa.

    WHEREFORE, plaintiff John Doe prays judgment as hereinafter set forth.

21

## COUNT IV – VIOLATION OF ARTICLE II SECTIONS 7 AND 17 OF THE MONTANA CONSTITUTION

76. Doe incorporates by reference all paragraphs of this Complaint as though fully set forth herein.

77. The Constitution of Montana in its Declaration of Rights provides protection for citizens of that state, including freedom of speech and expression under Article II Section 7, and due process of law under Article II Section 17.

78. The University, a corporation of the State of Montana, is obligated to recognize and respect those privileges and rights protected under the Constitution of Montana.

79. The University and Kujawa failed to protect Doe's freedom of expression by investigating him for his stated beliefs on transgender identity after specifically asking him to share those private beliefs.

80. The University failed to protect Doe's due process rights when it sanctioned him without any investigation and failed to conduct an impartial and unbiased investigation into the claims against him.

81.   The University further failed in protecting Doe's due process rights by denying him the ability to question his accusers at his appeal hearing.

WHEREFORE, plaintiff John Doe prays judgment as hereinafter set forth.

## COUNT V – NEGLIGENCE

82.   Doe incorporates by reference all paragraphs of this Complaint as though fully set forth herein.

83.   In its interactions with Doe, through adoption of the Discrimination Policy and Grievance Procedures, and in conducting its investigation and adjudication of Jane Roe's complaint, the University owed a duty to Doe to exercise reasonable care, with due regard for the truth, established procedures, and the important and irreversible consequences of its actions.

84.   The University also owed a duty to Doe to take care in hiring and providing proper training for all faculty and staff members who would interact with Doe, to ensure that they understood the requirements of Title IX and the University policies and procedures and would protect Doe's due process rights as they conducted an impartial investigation.

23

85. Kujawa was clearly negligent in failing to abide by the University's Grievance Procedures. Kujawa had a duty to report her suspicions to the University and allow the University to conduct a proper investigation.

86. Kujawa negligently shared Doe's private beliefs with another student who she knew or should have known would be negatively impacted by the information she was never intended to receive.

87. The University, acting through its agents and employees, breached a duty to Doe by carelessly, improperly, and negligently performing its assigned duties, mischaracterizing the truth and facilitating a process that violated Doe's constitutionally protected rights and interests.

88. As a direct and proximate result of the University's negligence and breach of duty, Doe suffered loss of educational opportunities, loss of income, and other future financial losses caused by a necessary relocation to a new school to complete his education. Further, the mark on his student record has rendered Doe unable to enroll in another university or to pursue his desired degree program, and will have a lasting impact on his ability to find employment in his field of choice.

89.  As a further direct and proximate result of the University's negligence, carelessness, and breach of duty, Doe has suffered and will continue to suffer from mental and emotional injuries for which compensation is warranted.

WHEREFORE, plaintiff John Doe prays judgment as hereinafter set forth.

## COUNT VI – BREACH OF CONTRACT

90.  Doe incorporates by reference all paragraphs of this Complaint as though fully set forth herein.

91.  The University and Doe entered into a contractual agreement upon receipt of Doe's enrollment and payment of tuition, that Doe and the University would both abide by the University's Discrimination Policy and Grievance Procedures.

92.  Doe made every effort to ensure that his disagreement with Roe's lifestyle would be kept private so that Roe would not be made uncomfortable during the class. These actions show a deep respect for Roe's individual right to live her life as she saw fit, regardless of Doe's personal and protected views on the matter.

25

93. The University and Kujawa breached their contractual duty to protect Doe's rights to privacy and afford him protections under the University's policies.

94. Kujawa held herself out as a person who could be confided in and trusted, and encouraged Doe to share his views openly, and then she blatantly reneged on the trust she instilled in Doe, causing irreparable damage to Doe's reputation, education, and future learning opportunities.

WHEREFORE, plaintiff John Doe prays that judgment be entered in his favor for (1) an amount in excess of Seventy-Five Thousand Dollars ($75,000.00); (2) punitive damages of at least One Hundred Fifty Thousand Dollars ($150,000.00); and (3) costs and such further relief as is just and equitable.

DATED: March 23, 2017

Respectfully submitted,

Monforton Law Offices, PLLC

By:   /s/ Matthew G. Monforton
      Matthew G. Monforton
      Attorney for Plaintiff