

FILED

DEC 2 1 2018

Clerk, U S District Court
District Of Montana
Helena

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MONTANA

# BUTTE DIVISION

| | |
|---|---|
| ERIK POWELL,<br><br>                           Plaintiff,<br><br>vs.<br><br>MONTANA STATE UNIVERSITY,<br>DR. ROBERT MOKWA, and JYL<br>SHAFFER, employees of Montana<br>State University, sued in their official<br>capacity,<br><br>                          Defendants. | No. CV 17-15-BU-SEH<br><br>**MEMORANDUM AND<br>ORDER** |

Before the Court are: (1) Defendants' Motion for Summary Judgment,[1] and

(2) Plaintiff's Motion for Partial Summary Judgment.[2] A hearing on both was

conducted on December 18, 2018.

---

[1] Doc. 114.

[2] Doc. 119.

## BACKGROUND

Plaintiff asserts claims[3] against: (1) Montana State University ("MSU"), a publicly incorporated university; (2) Robert Mokwa ("Mokwa"), Executive Vice President and Provost of MSU; and (3) Jyl Shaffer ("Shaffer"), Director and Title IX Coordinator in MSU's Office of Institutional Equity ("OIE"). Mokwa and Shaffer (the "Individual Defendants") are named in their official capacities only.[4]

Plaintiff's Count I alleges violation of the Fourteenth Amendment Due Process clause under 42 U.S.C. § 1983 ("§ 1983") against the Individual Defendants; Count II, violation of the First Amendment, under § 1983, against the Individual Defendants; Count III, violation of Title IX of the Education Amendments under 20 U.S.C. § 1681 ("Title IX") against MSU; and Count IV, Declaratory Judgment against the Individual Defendants.[5]

In Counts I and II, Plaintiff seeks:

> (1) a permanent injunction (a) restraining Mokwa and
> Shaffer, and all those acting in concert with them and/or
> MSU, from continuing to enforce any punishment
> against Plaintiff and from making any notation on
> Plaintiff's transcript or keeping any record relating to his

---

[3] The claims as now stated are pleaded in the Plaintiff's Fourth Amended Complaint filed on August 10, 2018.

[4] *See* Doc. 110 at 2–3.

[5] *See* Doc. 110 at 24–37.

2

disciplinary hearing in Plaintiff's educational or disciplinary records, regarding this matter and (b) ordering that all records of the finding of responsibility for Hostile Environment Harassment be rescinded and expunged from any of Powell's student records held by MSU;[6]

In Count III, Plaintiff requests:

(1) compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000) against MSU;
(2) a permanent injunction (a) restraining MSU, and all those acting in concert with MSU, from continuing to enforce any punishment against Plaintiff and from making any notation on Plaintiff's transcript or student records or keeping any record relating to his disciplinary hearing in Plaintiff's educational records, and (b) ordering that all records of the finding of responsibility for Hostile Environment Harassment be rescinded and expunged from any of Powell's student records held by MSU;[7]

Count IV demands:

[A] declaration against Mokwa and Shaffer that (a) Powell's speech was protected by the First Amendment, (b) that Powell should never have been punished for his speech, and (c) the Title IX investigation and sanctions against Powell violated his Due Process rights.[8]

---

[6] Doc. 110 at 28–29.

[7] Doc. 110 at 35–36.

[8] Doc. 110 at 37.

3

Plaintiff has moved for partial summary judgment on Count I, Count II, and Count IV.[9] Defendants request summary judgment dismissal of all counts.[10]

## UNDISPUTED FACTS

The following material facts are not disputed:[11]

1. "Erik Powell ("Powell") was a student [at MSU] during the summer semester of 2016" and was enrolled in a Contemporary Issues in Human Sexuality class taught by Katharine Kujawa ("Kujawa").[12] Myka Perry ("Perry") was also enrolled in the class.[13]

2. Powell, as a student and participant in Kujawa's class, signed and submitted to her at her direction a "Contemporary Issues in Human Sexuality Confidentiality Agreement" which stated:

> This course discusses many topics which can be sensitive to many individuals. In addition, this course relies heavily on open and non-judgmental discussion of these sometimes sensitive topics. Because of this, it is necessary for everyone to agree to maintain

---

[9] *See* Doc. 119 at 2–3.

[10] *See* Doc. 114 at 2.

[11] The undisputed facts stated are drawn from statements acknowledged as undisputed in each parties' Statements of Disputed Facts. *See* Docs. 122 and 126.

[12] Doc. 122 at 2.

[13] *See* Doc. 122 at 3.

confidentiality about what is discussed and, particularly, of any personal experiences shared with the class.

I the undersigned, understand the need for confidentiality for both myself and my classmates. Because of this, I agree to not share any personal experiences or personal identifying information with people outside of [this] class. In addition, I agree not to berate or judge others for their opinions and agree to go into every discussion with an open mind and with a quest for understanding. In doing so, I will support a positive classroom environment where I and others feel comfortable to share their experiences and their thought processes.[14]

3.    When Powell and Perry attended class on May 24, 2016, "the topic of discussion was transgender issues."[15] "Perry advised the class that she identified as being transgender."[16] "Powell was uncomfortable with transgender lifestyles [and] opted not to speak in class . . . ."[17]

4.    "After class on May 24, 2016, Powell spoke with Kujawa [in her office] believing that their conversation was confidential."[18] During the meeting, "Powell stated [to Kujawa] he did not want to sit next to Perry as doing so may

---

[14] Doc. 121–11.

[15] Doc. 122 at 2.

[16] Doc. 126 at 3.

[17] Doc. 126 at 3.

[18] Doc. 126 at 4.

result in a confrontation or altercation."[19] He explained his discomfort with Perry and transgender people in general, but that he "'didn't want to upset [Perry] with his opinions.'"[20] Powell further stated that he would not "'be comfortable speaking with [Perry] outside of class . . . .'"[21] During the meeting, "Powell relayed a story to Kujawa where he told her that the only time he had a physical altercation with a member of the LBGT community [which occurred some nine years earlier] when a man, who [Powell later] learned was gay, groped [Powell's] girlfriend."[22]

5.    "On May 26, 2016, almost two full days after her meeting with Powell, Kujawa filed an on-line Safety & Welfare Reporting Form with the Dean of Student's office."[23] That same day, Aaron Grusonik ("Grusonik"), Associate Dean of Students, "created a safety and welfare case and scheduled a meeting with [Powell]" that afternoon."[24]

---

[19] Doc. 122 at 4.

[20] Doc. 126 at 4.

[21] *See* Doc. 126 at 5. A critical factual dispute remains as to whether Powell stated to Kujawa during the meeting that, if Perry persisted in speaking with him, "he would 'break her face.'" Kujawa asserts the statement was made by Powell. Powell denies it. *See also* Doc. 122 at 6.

[22] Doc. 126 at 5.

[23] Doc. 126 at 6.

[24] Doc. 121-31 at 2.

6.     After class on May 26, 2016, Kujawa informed Perry of the conversation she had with Powell on May 24, 2016.[25] "Perry asked Kujawa if she should file a report with the Office of Institutional Equity ("OIE") and Kujawa said 'If you like.'"[26] "Kujawa [also] asked Perry if she felt safe walking to OIE and if she needed an escort. Perry advised Kujawa she felt comfortable walking by herself and showed Kujawa a pocketknife."[27]

7.     On May 26, 2016, "Perry filed a complaint with [OIE]."[28] "Perry relayed to Shaffer what she had been told by Kujawa. Shaffer then called Kujawa . . . to confirm what [Kujawa] had relayed to Perry."[29]

8.     "On May 26, 2016, Shaffer assigned James Sletten ("Sletten")[30] [as investigator] to the case."[31] "Perry advised Shaffer that she knew Sletten."[32]

---

[25] *See* Doc. 126 at 6.

[26] Doc. 126 at 6.

[27] Doc. 126 at 7.

[28] Doc 122 at 9; *see also* Doc. 126 at 7 and 122 at 9.

[29] Doc. 126 at 7.

[30] Sletten was employed by MSU at the time as "the Title IX and Civil Rights Investigator/Deputy Title IX Coordinator." Doc. 122 at 11.

[31] Doc. 126 at 8.

[32] Doc. 126 at 8.

"Sletten and Shaffer discussed bringing in someone from the outside to deal with conflicts but deemed it unnecessary."[33]

9.      On May 26, 2016, Powell was informed that a formal complaint had been filed against him and that a trespass warning, interim suspension, and no-contact order had been issued.[34]

10.      At 4:42 p.m. on May, 26, 2016, Shaffer sent an email to Perry which included: "[t]hank you for coming in and telling us what happened. I appreciate so much that you trusted us with this information."[35] Shaffer also informed Perry in the email that Powell was aware of the interim restrictions in place against him and that Perry should utilize campus police if she felt uncomfortable.[36]

11.      OIE lifted Powell's interim suspension and trespass warning on June 2, 2016, with the exception that he was "still prohibited from coming on campus by the [OIE] for the duration of [the] investigation."[37] A renewed mutual no-contact order between Powell and Perry also was issued.[38]

---

[33] Doc. 126 at 9.

[34] See Doc. 126 at 12–13.

[35] Docs. 121-21 at 1, 126 at 9.

[36] See Doc. 121-21 at 1–2.

[37] Doc. 121-8 at 2.

[38] See Doc. 121-7.

12. Four days later, on May 31, 2016, and after Powell had been suspended, Sletten interviewed Powell, Perry, and Kujawa.[39]

13. "On June 3, 2016, Sletten provided to Perry and Powell [an] initial factual summary of his investigation and requested their responses by June 8, 2016."[40] Powell responded with "comments and corrections."[41] Perry provided no response.[42]

14. Sletten submitted his "final report of the investigation" ("Sletten's Report") on June 9, 2016.[43]"Shaffer and Sletten [both] found that the specific allegation of Hostile Environment Harassment was substantiated and that Powell had violated MSU's *Discrimination, Harassment, Sexual Misconduct, Dating, Violence, Domestic Violence, Stalking and Retaliation* policy ("Harassment Policy")."[44] Shaffer had "the final authority on all investigations and findings."[45]

---

[39] *See* Doc. 126 at 15.

[40] Doc. 126 at 16.

[41] Doc. 126 at 16.

[42] *See* Doc. 126 at 16.

[43] Doc. 126 at 17.

[44] Doc. 126 at 18. The Harassment Policy states:

224.00 Hostile Environment Harassment. A *Hostile Environment* based on . . . gender identity, gender expression, or sexual orientation exists when harassment:

15.     On June 10, 2016, Sletten informed Shaffer: "I spoke with [Perry]

yesterday and she seem[ed] to be in better spirits. [Perry] is interested in going to

---

- is sufficiently serious (i.e., severe, pervasive or persistent)
  and objectively offensive so as to deny or limit a person's
  ability to participate in or benefit from the University's
  programs, services, opportunities, or activities; or
- when such conduct has the purpose or effect of
  unreasonably interfering with an individual's employment
  or academic performance.

A hostile environment can be created by anyone involved in a
university program or activity (e.g., administrators, faculty
members, students, and even campus guests). Mere offensiveness
is not enough to create a hostile environment. Although repeated
incidents increase the likelihood that harassment has created a
hostile environment, a serious incident, such as a sexual assault,
even if isolated, can be sufficient.

Determining whether harassment creates a hostile environment, the
harassment will be considered not only from the perspective of the
individual who feels harassed, but also from the perspective of a
reasonable person in a similar situation. Also, the following factors
will be considered:

- The degree to which the conduct affected one or more
  students' education or individual's employment;
- The nature, scope, frequency, duration, and location of the
  incident or incidents;
- The identity, number and relationships of the persons
  involved;
- The perspective of a "reasonable person" in the same
  situation as the person harassed; and
- The nature of higher education.

Doc. 121-6 at 5-6.

[45] Doc. 126 at 18.

the Big Sky Pride Parade, but isn't sure if she will be able to make it. I offered a ride and she said that she'll get back to us next week."[46]

16.     "Powell appealed the OIE findings,"[47] submitting the appeal to "University President Waded Cruzado" ("Cruzado").[48] Three bases for the appeal were asserted: (1) "OIE failed to conduct an investigation in compliance with its own procedures"; (2) "RO [Reviewing Officer] failed to conduct an adequate investigation"; and (3) "OIE failed to conduct an impartial and unbiased investigation."[49] Cruzado recused himself from the appeal and appointed Mokwa "to oversee the appeal and issue the University decision."[50]

17.     On June 15, 2016, Shaffer emailed Perry an update on the OIE investigation which included words of encouragement to her and the statement that "Orlando knocked the wind out of me, and I'm only an aspiring ally. If you need support please know I am here for you, as is my staff."[51] On the same day,

---

[46] Doc. 121-22 at 1.

[47] Doc. 126 at 20; *see also* Doc. 122 at 20.

[48] Doc. 122 at 20.

[49] Doc. 122 at 20-21.

[50] Doc. 122 at 21.

[51] Doc. 121-25 at 1.

OIE issued an update of Powell's interim sanctions, including that the campus ban and no-contact order would remain in place during Powell's appeal.[52]

18.    On July 21, 2016, Robert Stutz ("Stutz"), Montana Assistant Attorney General, appointed as hearing officer on Powell's appeal, conducted a hearing on the appeal.[53] Powell requested Perry and Kujawa's presence as witnesses at the hearing.[54] Both declined to attend.[55]

19.    On August 15, 2016, Stutz issued a written decision on Powell's appeal ("Appeal Decision"), reciting that: (1) "Powell [did] not substantiate[] the existence of any grounds for appeal"; and (2) concluding that Sletten's "Report should be approved."[56]

20.    "On August 17, 2016, [] Mokwa determined 'Based upon the [Appeal Decision], I support the findings that the evidence submitted provides a reasonable basis for the resulting decision. In addition, there were no procedural errors so substantial as to deny a fair hearing to either party.'"[57]

---

[52] *See* Doc. 121-16.

[53] *See* Doc. 122 at 23–24.

[54] *See* Doc. 126 at 22.

[55] *See* Doc. 126 at 22.

[56] Docs. 126 at 23, 121-1 at 9.

[57] Doc. 122 at 24.

21.     "On August 25, 2016, Sletten prepared a Sanctioning Recommendation for [Powell] for [Dean of Students, Dr. Caires ("Caires")]."[58]

22.     Under MSU's Discrimination Grievance Procedures, the responsible officer "makes recommendations for remedial actions," and "[i]n the case of student Respondents, the Discipline Authority is [vested in] the Dean of Students or other University official with the authority to impose discipline on students," and impose sanctions.[59]

23.     On September 1, 2016, Caires issued a Sanctions Letter to Powell: (1) suspending him from MSU for the Fall 2016 semester; (2) prohibiting him from having access to MSU-Bozeman facilities through December 31, 2016; (3) restricting him from making any contact with Perry; (4) requiring completion of anger management training prior to re-enrollment; (5) requiring completion of civil rights training prior to re-enrollment; and (6) requiring completion of a Campus Safety Questionnaire upon re-enrollment.[60]

---

[58] Doc. 126 at 24.

[59] Doc. 121-5 at 8.

[60] *See* Doc. 121-32 at 1–2.

24.    On September 30, 2016, Powell filed an appeal of Mokwa's decision to Commissioner of Higher Education, Clayton Christian ("Christian").[61]

25.    On December 22, 2016, Christian denied Powell's appeal and affirmed Mokwa's decision "and sanctions imposed by the Dean of Students."[62]

26.    "Powell received a tuition refund for the summer courses he enrolled in at MSU during the Summer 2016 term."[63] "[He] subsequently enrolled at Montana State University-Northern in Havre, beginning in January 2017, and is in good standing at that university."[64]

## DISCUSSION

Fed. R. Civ. P. 56 provides in part "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[65] "In determining

---

[61] *See* Doc. 116-17 at 1.

[62] Doc. 116-19 at 7.

[63] Doc. 122 at 27.

[64] Doc. 122 at 30. Although the Court finds it unnecessary to address at this time, the Harassment Policy plainly states that sanctions imposed against a student at one MSU campus apply equally at all MSU campuses. The apparent inconsistencies in policy application and enforcement at separate MSU campuses have not been addressed or resolved.

[65] Fed. R. Civ. P. 56.

14

whether summary judgment is appropriate, [the court] view[s] the evidence in the light most favorable to the non-moving party."[66]

### Defendants' Motion for Summary Judgment
### First Amendment Claim

Plaintiff's § 1983 claim is grounded in an asserted violation of his First Amendment rights.[67] Current case law supports the proposition that a university may "regulate speech and expressive conduct as long as the regulation [is] 'reasonable' and viewpoint neutral."[68] However, it cannot punish a student for expressing a particular viewpoint.[69] Material facts in dispute preclude summary judgment on this claim.

"[T]rue threat[s]" are not protected by the First Amendment,[70] including "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of

---

[66] *Garcia v. Cty. of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011)(citing *Huppert v. City of Pittsburg*, 574 F.3d 696, 701 (9th Cir. 2009)).

[67] *See* Doc. 110 at 29–32.

[68] *O'Brien v. Welty*, 818 F.3d 920, 931 (9th Cir. 2016) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46 (1983)).

[69] *See O'Brien*, 818 F.3d at 931 (citing *Perry Educ. Ass'n*, 460 U.S. at 46).

[70] *Virginia v. Black*, 538 U.S. 343, 359 (2003) (citing *Watts v. United States*, 394 U.S. 705, 708 (1969)).

individuals."[71] "[The] prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.'"[72] Actual intent to carry out the threat is not required.[73]

Furthermore, a true threat is one that, when considered in light of "the whole factual context and 'all of the circumstances' . . . 'is so *unequivocal, unconditional, immediate and specific* as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution.'"[74]

Kujawa contends that during the discussion in her office, Powell stated "'that if [Perry] approached him, he would . . . pull her aside and say I'm not comfortable with you speaking to me. Please don't talk to me outside of class. And . . . that if she persisted and wanted to continue to talk to him, that he would break her face.'"[75] Powell denies having made this statement. Whether he made

---

[71] *Virginia*, 538 U.S. at 359-60 (citing *Watts*, 394 U.S. at 708).

[72] *Virginia*, 538 U.S. at 359–60 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)).

[73] *See Virginia*, 538 U.S. at 359–60 (citing *R.A.V.*, 505 U.S. at 388).

[74] *Planned Parenthood of Columbia/Willamette, Inc. v. American Coal. of Life Activists*, 290 F.3d 1058, 1078 (9th Cir. 2002) (quoting *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976)) (emphasis added).

[75] Doc. 115 at 8-9.

the statements during his meeting with Kujawa as claimed, and to what extent the statements could be said to have been "unequivocal, unconditional, immediate, and specific," remain unresolved.

Additional factual disputes exist as to Powell's description of an encounter with a self-described gay man some nine years earlier, and about Powell having loaded guns in his truck.[76] A thorough assessment of these facts cannot be ignored and are material to whether any or all of the Defendants violated Powell's First Amendment rights. All impact the questions of: (1) whether Powell made the statement to Kujawa which she asserts was made; (2) whether the statement was "so unequivocal, unconditional, immediate and specific;" (3) whether any statement, if made, was a true threat against Perry; (4) whether MSU's response and subsequent course of action following the meeting complied with its own Discrimination/Harassment policy; (5) whether established facts support MSU's decisions for sanctions against Powell; and (6) whether the policy, as upheld and applied by MSU, met and complied with requirements of constitutional due process.

---

[76] *See* Doc. 74 at 4–8.

## *Procedural Due Process Claim*

Disputed material facts outlined above remain with respect to Plaintiff's § 1983 claim grounded in an asserted violation of his due process rights.[77] When a due process issue is presented, "'the question remains what process is due."[78] Procedural due process requires, at a minimum, that a student suspended for disciplinary reasons "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."[79] Such a requirement is a "precaution[] against unfair or mistaken findings of misconduct and arbitrary exclusion from school."[80]

Factors to be considered in addressing the due process issue include: "[(1)] the private interest that will be affected by the official action; [(2)] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [(3)] the Government's interest, including the function involved and the fiscal and

---

[77] *See* Doc. 110 at 24–29.

[78] *Goss v Lopez*, 419 U.S. 565, 577 (1975) (quoting *Morrissey v Brewer*, 408 U.S. 471, 481 (1972)).

[79] *Goss,* 419 U.S. at 581.

[80] *Goss*, 419 U.S. at 581.

administrative burdens that the additional or substitute procedural requirement would entail."[81] Here, a serious, unresolved, and at this time unresolvable question remains as to whether the process provided by MSU met the established standards described above.

Engagement of "an impartial decision maker is a fundamental right" that cannot be denied without due process of law.[82] However, a student alleging impartiality is obliged to "'overcome a presumption of honesty and integrity' on the part of decision-makers,"[83] and must be prepared to demonstrate that the adjudicator charged with impartiality "'has prejudged, or reasonably appears to have prejudged, an issue.'"[84]

Here, Plaintiff has raised issues of bias on the part of persons assigned to his case by MSU and who were charged with the responsibility to undertake and carry out the investigation and disciplinary process. Unresolved issues of material fact relevant to those matters remain. The Court, on the present record, cannot conclude or undertake to conclude that one or more of those involved in the

---

[81] *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

[82] *Charfauros v. Bd. of Elections*, 249 F.3d 941 (9th Cir. 2001) (citing *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970)). *See also Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995).

[83] *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995) (quoting *Withrow*, 421 U.S. at 46).

[84] *Stivers*, 71 F.3d at 741 (quoting *Kenneally v Lungren*, 967 F.2d 329, 333 (9th Cir. 1992)).

investigation did not prejudge a material issue and thereby taint the entire investigation with bias.

Some courts have concluded generally that a university student facing disciplinary charges and suspension does not have the right to cross-examine witnesses against him.[85] However, in *Doe v. University of Cincinnati*, the Sixth Circuit determined that cross-examination was required in a sexual assault proceeding where the accused student faced a two-year suspension.[86]

As recently as September 2018, the Sixth Circuit reaffirmed its holding in *Doe*,[87] reiterating that "when [a] university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination."[88] Although the Ninth Circuit has not yet adopted the Sixth Circuit's requirements, it has expressed its view that a charge resulting in a disciplinary suspension of a student "may require more formal procedures" to satisfy components of our system of constitutional due process.[89]

---

[85] *See Gorman*, 837 F.2d at 16; *See also Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir. 1972); *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150 (5th Cir. 1961).

[86] *See Doe v. Univ. of Cincinnati*, 872 F.3d 393, 400 (6th Cir. 2017).

[87] *Doe v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018).

[88] *Baum*, 903 F.3d at 581 (citing *Doe*, 872 F.3d 393 and *Flaim v. Med. Coll. Of Ohio*, 418 F.3d 629 (6th Cir. 2005)).

[89] *Oyama v. Univ. of Haw.*, 813 F.3d 850, 875 (9th Cir. 2015).

Like both *Doe* and *Baum*, the decision made by MSU was a "he said/she said" dispute turning on credibility.[90] Specifically, MSU's investigation hinged on what was said between two parties during a private conversation. "[I]f a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process."[91] As stated above, unresolved issues of fact material to Plaintiff's due process claim remain which preclude summary judgment on the issue.

Issues of material fact continue to be present regarding Shaffer's conduct in the selection of Sletten as investigator and in the conduct of the investigation by Sletten without prejudgment of the issue of Powell's guilt. Correspondence and exchanges between Sletten, Shaffer, Perry, and Assistant Dean of Students Grusonik, viewed in the light most favorable to the Plaintiff, establish that questions of material fact remain as to whether Sletten's investigation was impartial and whether Shaffer unfairly prejudged OIE's investigation against Powell. Moreover, MSU's imposition of sanctions against Powell before any decision on the merits of Perry's complaint had been reached clearly calls into question whether MSU itself inappropriately prejudged the case.

---

[90] *See Baum*, 903 F.3d at 583 (citing *Doe*, 872 F.3d at 395, 402).

[91] *Baum*, 903 F.3d at 581 (citing *Doe*, 872 F.3d 393 and *Flaim*, 418 F.3d 629).

Here, the parties remain in dispute over matters related to the severity and extent of Powell's punishment, specifically, whether a "hold" still remains on his account, preventing him from returning to MSU-Bozeman, whether his suspension remains part of his official permanent record, and whether a background check on Powell would reveal records of the investigation and sanctions.[92] Such facts are material to the question of whether Powell had a right to cross-examine witnesses and to several of the *Mathews* factors, including "[(1)] the private interest that will be affected by the official action; [(2)] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [(3)] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[93]

As stated above, significant unresolved issues of material fact remain that relate to Powell's asserted right of confrontation and cross-examination. At this point, the undisputed record establishes that MSU suspended and removed Powell from MSU, barred him from a public university campus and imposed additional sanctions on the basis of a single statement claimed to have been made by him to

---

[92] *See* Doc. 94 at 23–26.

[93] *Mathews*, 424 U.S. at 335. *See also Baum*, 903 F.3d at 582.

an instructor, in what he believed to be a confidential meeting with her. It was this same single statement attributed to Powell, and which he denies, that MSU determined constituted a violation of its Hostile Environment Policy.[94]

The MSU policy statement, taken as a whole, strongly suggests that more than a single statement, made, if at all, under the circumstances and in the setting described by Kujawa, is required to support a finding of a "hostile environment." Moreover, the claimed statement was not even made to Perry, the alleged victim, or in her presence. By the record, it was conveyed to her and to others only through a third person when Powell was not present.

In addition, the question remains whether the sanctions imposed against Powell beyond suspension from the university, including a ban from campus, ban from contact with Perry, and the requirements for anger management training and civil rights training were constitutionally permissible as prerequisites to readmission to MSU.

### Title IX Claim

Title IX of the Education Amendments of 1972 ("Title IX") provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under

---

[94] *See supra*, n. 42.

any education program or activity receiving Federal financial assistance."[95] It is understood to "bar the imposition of university discipline where gender is a motivating factor in the decision to discipline."[96]

Powell asserts that MSU "treated . . . Perry [and himself] differently under Title IX by ignoring Perry's threatening gesture of showing a pocket knife when asked about her concerns about a potential encounter with Powell," while finding that Powell violated MSU policy by virtue of a statement allegedly made to Kujawa and directed toward Perry.[97] Powell further asserts MSU discriminated against him based on his gender by conducting a biased investigation in favor of Perry.[98] These alleged disparate treatments, he claims, amounted to a violation of Title IX.

A private right of action for money damages stemming from a violation of Title IX has indeed been recognized by the Supreme Court.[99] But because Title IX

---

[95] 20 U.S.C. § 1681(a) (2017).

[96] *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) (citing Civil Rights Act of 1991, § 107(a), 42 U.S.C. § 2000e–2(m) (Supp. IV 1992) ("an unlawful employment practice is established when . . . sex . . . was a motivating factor or any employment practice, even though other factors motivated the practice") .

[97] Doc. 55 at 22-23.

[98] *See* Doc. 110 at 34.

[99] *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639 (1999).

has been "repeatedly treated as legislation enacted pursuant to Congress' authority under the Spending Clause . . . private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue."[100] A federal funding recipient such as MSU can be liable for violation of Title IX if it reaches an erroneous decision in a disciplinary proceeding based on gender bias.[101]

Here, MSU could be found to have "acted erroneously" particularly in light of the record that MSU ultimately acted adversely to Powell's interests by removing him from the university notwithstanding that Powell had complied with Kujawa's requirement that her students execute a confidentiality agreement and notwithstanding that it took no action related to the undisputed statement of Perry about possession of a knife. Furthermore, Sletten's and Shaffer's treatment of Perry during the investigation could be found to have been biased. Whether disparate treatment between Powell and Perry, as claimed by Powell, occurred, and whether, if it did occur, it can be said MSU acted erroneously, cannot be resolved as a matter of law at this point. Genuine issues of material fact exist as to

---

[100] *Davis*, 526 U.S. at 640 (citations omitted).

[101] *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018).

whether MSU's actions were biased or discriminatory. The Title IX claim, for now, remains viable.

### *Plaintiff's Motion for Partial Summary Judgment*

The Court has determined, as stated above, that issues of fact preclude summary judgment in favor of Defendants on Counts I, II, and IV. Plaintiff likewise is not entitled to summary judgment on the same claims.

Plaintiff further argues, however, that the MSU policy he was found to have violated is facially unconstitutional under the First Amendment. As written, the policy prohibits "Hostile Environment Harassment" which can be created by harassment based on, *inter alia*, "gender expression," that is "sufficiently serious . . . and objectively offensive so as to deny or limit a person's ability to participate in or benefit from the University's programs, services, opportunities or activities."[102]

The policy itself explains that "[m]ere offensiveness is not enough to create a hostile environment," and that "[i]n determining whether harassment creates a hostile environment, the harassment will be considered not only from the perspective of the individual who feels harassed, but also from the perspective of a

---

[102] Doc. 74-4 at 5.

reasonable person in a similar situation."[103] The policy language further directs

that certain factors must be considered in determining whether a hostile

environment in fact or in substance was present, including:

- The degree to which the conduct affected one or more students' education;
- The nature, scope, frequency, duration, and location of the incident;
- The identity, number, and relationships of the persons involved;
- The perspective of a 'reasonable person' in the same situation as the person harassed; and
- The nature of higher education."[104]

This policy, arguably is not unconstitutionally overbroad or vague on its

face. Rather, it contains limitations intended to protect against the university

imposing overly restrictive limits on protected speech. In the university setting,

speech is protected only from unreasonable regulation that favors a particular

viewpoint.[105] Universities may regulate speech within reasonable bounds to

"ensur[e] a safe context for learning and teaching."[106]

---

[103] Doc. 74-4 at 5–6 (emphasis added).

[104] Doc. 74-4 at 5–6.

[105] *See O'Brien*, 818 F.3d at 931 (citing *Perry*, 460 U.S. at 46).

[106] *O'Brien*, 818 F.3d at 931 (citing *Perry*, 460 U.S. at 50-51).

The MSU policy establishes that a hostile environment is not created by "mere offensiveness." This provision itself may be said to reduce the potential for inappropriate restrictions on viewpoint-based distinctions in speech. Moreover, neither the complainant nor the investigator would be entitled to claim a violation of this policy because he or she was offended by the speaker's viewpoint. Rather, harassment that violates the policy must have been severe enough to deny or limit a person's ability of access or participation in MSU's programs and services. The policy likewise required consideration of an objective, reasonable person's perspective in making a determination of whether the policy was violated, not just that of the complainant.

In this case, MSU, acting through its designated and selected personnel, made a determination of violation of the policy by Powell without evidence of record of meaningful consideration having been accorded to the required adequate reasonable-person perspective. A separate issue also remains as to whether MSU's policy, as interpreted and applied in this case, exceeded the bounds of constitutionally permitted conduct and action.

At a minimum, MSU's application of the policy in the manner it selected and carried out, leaves open and unanswered questions of material fact and issues of law which preclude a summary judgment that upholds the policy as applied by

MSU, in suspending Powell as a student, in excluding him from the MSU campus, and in imposing other sanctions against him that were facially penal in nature.

While Plaintiff seeks summary judgment on his declaratory judgment claim, this claim rests upon the grounds of a violation of his First Amendment and procedural due process rights. The Court has determined that issues of fact preclude summary judgment on those claims. Plaintiff is not entitled to summary judgment on his declaratory judgment claim.

### *Eleventh Amendment Immunity*

The Eleventh Amendment bars unconsented lawsuits in federal court against states or the "arms" of states.[107] An arm of state includes state universities for purposes of sovereign immunity.[108] "A state waives its Eleventh Amendment immunity if it "'unequivocally evidence[s its] intention to subject itself to the jurisdiction of the federal court.'"[109] Defendants assert Eleventh Amendment immunity as an affirmative defense requiring dismissal of certain claims against the individual Defendants.

---

[107] U.S. Const. amend. XI; *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984).

[108] *See Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007).

[109] *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1021 (9th Cir. 2010) (quoting *Hill v Blind Indus. & Servs. of Md.*, 179 F.3d 754, 758 (9th Cir. 1999).

Issues of fact preclude summary judgment on Eleventh Amendment immunity grounds for official capacity claims against the Individual Defendants in Counts I, II, and IV. "Actions seeking only prospective declaratory or injunctive relief against state officers in their official capacities,"[110] are not barred by the Eleventh Amendment if the actions are directed to an "ongoing violation of federal law."[111]

Defendants argue that no "ongoing violation" is occurring.[112] Issues of fact nevertheless preclude such a finding on summary judgment. The continuing dispute over the effects of the OIE investigation and the sanctions against Powell remain unresolved.

Furthermore, the record is not clear, at this stage, as to which of the Individual Defendants, in his or her official capacity, was or were sufficiently connected with Powell's claims of ongoing violations to be subject to such an injunction. Such facts are material to whether the Individual Defendants are

---

[110] *Los Angeles Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) (citing *Ex Parte Young*, 209 U.S. 123 (1908)); *See also Edelman v. Jordan*, 415 U.S. 651, 667-68 (1974); *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 840 (9th Cir. 1997); *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Id.*, 521 U.S. 210, 296 (1997)).

[111] *See Los Angeles Cty. Bar Ass'n*, 979 F.2d at 704.

[112] Doc. 65 at 20–21.

immune from suit under the doctrine of *Ex Parte Young*.[113] Summary judgment on Eleventh Amendment grounds cannot be granted.

ORDERED:

Defendants' Motion for Summary Judgment[114] and Plaintiff's Motion for Partial Summary Judgment[115] are DENIED. Counts I, II, III and IV survive and will be set for trial.

DATED this 21st day of December, 2018.

SAM E. HADDON
United States District Judge

---

[113] *See Young*, 209 U.S. at 157.

[114] Doc. 114.

[115] Doc. 119.